# UNITED STATES DISTRICT COURT

for the

District of Alaska

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Apple Macbook Pro2, Serial NumberYM0410CWEUE,
and Apple iPhone, IC# 579C-E2430A

)
)
)
)
)

Case No. 3:14-MJ-00326-DMS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ ALASKA _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251 | Production of Child Pornography |
| 18 U.S.C. §§ 2252 and 2252A | Distribution and Possession of Child Pornography |
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor |

The application is based on these facts:

See Attached Affidavit of Federal Bureau of Investigation Special Agent Jolene Goeden

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SIGNATURE REDACTED

_____
*Applicant's signature*

JOLENE GOEDEN, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/3/14

/S/ DEBORAH M. SMITH
U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED
*Judge's signature*

City and state: Anchorage, Alaska

DEBORAH M. SMITH, United States Magistrate Judge
*Printed name and title*

000001

**Attachment D, Page 1 of 60**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF )
                                       )
Apple Macbook Pro2, Model#A1289, )
Serial NumberYM0410CWEUE, and )
                                       )
Black iPhone, Model A1387, IC#579C- )
E2430A )
                                       )

Case No. 3:14-MJ-00326-DMS

**UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **JOLENE A. GOEDEN**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search an Apple Macbook Pro2 computer, model number A1289, serial number YM0410CWEUE, and a black iPhone cell phone, model A1387, IC#579C-E2430A (hereinafter "SUBJECT COMPUTER" and "SUBJECT CELL PHONE," and jointly "SUBJECT DEVICES") further described in Attachment A, for the things described in Attachment B.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since April 2004. In this assignment I have investigated a number of violations of United States Code. For the past several years, I have

Page 1 of 56

NOV00000214

specialized in the investigation of crimes against children including but not limited to internet crimes against children, online enticement of children, child pornography possession and distribution, and commercial sexual exploitation of children. Further, I have conducted and participated in a large number of search warrants, arrest warrants, and interviews of people involved in crimes against children. I am a member of the Alaska Internet Crimes Against Children Task Force and routinely discuss the aspects of investigating these types of cases with other law enforcement and prosecutors. I have also attended trainings specific to the use of computers in the commission of crimes against children.

3. This affidavit is made in support of an application for a warrant to search the SUBJECT DEVICES which are more particularly described in Attachment A, which were originally seized by the United States Army Criminal Investigative Division (CID) on January 18, 2014, and to seize the items specified in Attachment B, which constitute instrumentalities, fruits, contraband, and evidence of violations, or attempted violations, or attempted violations, of 18 U.S.C. §§ 2251, 2252(a)(2), 2252A(a)(2), 2252(a)(4)(B), and 2252A(a)(5)(B), production, distribution, receipt and possession of visual depictions of minors engaging in sexually explicit conduct and child pornography; and 2422(b), coercion and enticement of a minor.

4. I am familiar with the information contained in this affidavit based upon the investigation I have conducted, which included conversations with law enforcement officers and others, and review of reports and database records.

000003 NOV -- 3 2014

5. Because I submit this affidavit for the limited purpose of securing a search warrant, I have not included each and every fact known to me or the government. I have only included those facts necessary to establish probable cause to believe that evidence of violations, or attempted violations, of 18 U.S.C. §§ 2251, 2252(a)(2), 2252A(a)(2), 2252(a)(4)(B), and 2252A(a)(5)(B); and 2422(b) are located on the SUBJECT DEVICES.

6. The relevant statutory authority and terms used in this affidavit and its attachments are described and defined below.

## RELEVANT STATUTES

7. This search warrant seeks instrumentalities, fruits, contraband, and evidence of violations, or attempted violations, or attempted violations, of the following statutes:

   a. 18 U.S.C. § 2251, makes it a crime to employ, use, persuade, induce, entice, or coerce any minor to engage in, or to have a minor assist any person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, if the person knows or has reason to know that such visual depiction will impact interstate or foreign commerce.

Page 3 of 56

NOV − 3 2014

000004

b. 18 U.S.C. §§ 2252(a)(2) and (b)(1) provide, in relevant part, that any person who knowingly receives, or distributes, any visual depiction using any means or facility of interstate or foreign commerce or that has been transported in or affecting interstate or foreign commerce, or which contains materials which have been transported in or affecting interstate or foreign commerce, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, or any person who attempts to do so, shall be guilty of a federal offense. Title 18, United States Code, Sections 2252A(a)(2) and (b)(1) provide, in relevant part, that any person who knowingly receives or distributes any child pornography or any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce transported in or affecting interstate or foreign commerce by any means, including by computer, or any person who attempts to do so, shall be guilty of a federal offense.

c. 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) provide, in relevant part, that any person who knowingly possesses, or knowingly accesses with intent to

000005   NOV – 3 2014

Attachment D, Page 5 of 60

view any visual depiction that has been transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been so transported, by any means including by computer, if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, or any person who attempts to do so, shall be guilty of a federal offense. Title 18, United States Code, Section 2252A(a)(5)(B) and (b)(2) provide, in relevant part, that any person who knowingly possesses, or knowingly accesses with intent to view, any material that contains an image of child pornography that has been transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been transported in or affecting interstate or foreign commerce by any means, including by computer, or any person who attempts to do so, shall be guilty of a federal offense.

d. 18 U.S.C. § 2422(b), makes it a crime for anyone, using the mail or any facility of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not

Page 5 of 56

000006

attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempt to do so.

## DEFINITIONS

8.   The following terms are relevant to this affidavit in support of this application for a search warrant:

   a.   *Child Erotica:*  The term "child erotica" means any material relating to minors that serves a sexual purpose for a given individual, including fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, and images or videos of minors that are not sexually explicit.

   b.   *Child Pornography:*  The term "child pornography" is defined at 18 U.S.C. § 2256(8).  It consists of visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the

Page 6 of 56

NOV – 3 2014

000007

production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2), (8).

c. *Minor:* The term "minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

d. *Sexually Explicit Conduct:* The term "sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

e. *Visual Depictions:* "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

9. The following technical terms are relevant to my affidavit in support of this application for a search warrant.

a. As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers[1] and other electronic devices that communicate with each

---

[1] The term "computer" is defined by 18 U.S.C. § 1030 (e) (1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage

NOV – 3 2014
000008

other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions including cellular networks and satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail").

b. Set forth below are an alphabetical listing of some definitions of technical terms, used throughout this Affidavit, and in Attachments A and B, hereto, pertaining to the Internet and computers more generally.

   i. *Compressed file*: A "compressed file" is a file that has been reduced in size through a compression algorithm to save disk space. The act of compressing a file will make it unreadable to most programs until the file is uncompressed.

---

functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device."

NOV − 3 2014

000009

ii. _Computer system and related peripherals, and computer media_:
As used in this Affidavit, the terms "computer system and
related peripherals, and computer media" refer to tapes,
cassettes, cartridges, streaming tape, commercial software and
hardware, computer disks, disk drives, monitors, computer
printers, modems, tape drives, disk application programs, data
disks, system disk operating systems, magnetic media floppy
disks, hardware and software operating manuals, tape systems
and hard drives and other computer-related operation
equipment, digital cameras, scanners, in addition to computer
photographs, and other visual depictions of such graphic
interchange formats, including but not limited to, JPG, GIF,
TIF, AVI, and MPEG.

iii. _Digital device_: A "digital device" includes any electronic system
or device capable of storing and/or processing data in digital
form, including central processing units; desktop, laptop or
notebook computers; tablets, internet-capable cellular phones
(smart phones), or personal digital assistants; wireless
communication devices such as telephone paging devices,
beepers, and mobile telephones; peripheral input/output devices
such as keyboards, printers, scanners, plotters, monitors, and

Page 9 of 56

000010

**Attachment D, Page 10 of 60**

drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, flash dirves, thumb drives, floppy disks, compact disks, DVDs, magnetic tapes, and memory chips; and security devices.

iv. _Domain Name_: "Domain names" are common, easy to remember names associated with an internet protocol address (defined below). For example, a domain name of "www.usdoj.gov" refers to the internet protocol address of 149.101.1.32.

v. _Hash value_: A "hash value" is a mathematical algorithm generated against data to produce a numeric value that is representative of that data. A hash value may be run on media to find the precise data from which the value was generated. Hash values cannot be used to find other data. The term "SHA-1" or "SHA-1 hash" refers to a type of hash valuethat may be given to a computer file. The SHA-1 is a cryptographic hash function designed by the United States National Security Agency and is a United States Federal Information Processing Standard. SHA stands for "secure hash algorithm." SHA-1 hash value is the standard for unique identifying numbers. It is computationally infeasible for two files with different content to

NOV − 3 2014
000011

**Attachment D, Page 11 of 60**

have the same hash values.  I am unaware of any instance in which two files have been naturally assigned the same SHA-1 hash value.

vi.  *Image or copy*: An "image or copy" is an accurate reproduction of information contained on an original physical item, independent of the electronic storage device.  "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

vii.  *Internet Service Providers (ISPs) and the Storage of ISP Records*: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including telephone-based dial-up, broadband-based access via digital subscriber line (DSL) or cable television, cellular networks, dedicated circuits, or satellite-based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign

000012

NOV 2 - 3 2014

each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP and can access the Internet. ISPs maintain business and other records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as

NOV – 3 2014

000013

the home directory. Such temporary, incidental storage is defined by statute as "electronic storage." *See* 18 U.S.C. § 2510 (15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long-term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." *See* 18 U.S.C. § 2711(2).

viii. *Internet Protocol Address (IP Address)*: Every computer or device on the Internet is referenced by a unique internet protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Some ISP's employ dynamic IP addressing, that is they allocate any unused IP addresses at the time of initiation of an Internet session each time a customer or subscriber accesses the

NOV – 3 2014
000014

**Attachment D, Page 14 of 60**

Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. Absent some break in service, static IP addresses generally do not change over a period of time, and typically remain assigned to a specific computer.

ix. *Log files*: "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a web site was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer

NOV − 3 2014

000015

Attachment D, Page 15 of 60

logs list detailed information concerning files that are remotely transferred.

x. *Malicious Software ("malware")*: Software designed to infiltrate a computer without the owner's informed consent is called "malicious software" or "malware." The expression is a general term used by computer professionals to mean a variety of forms of hostile, intrusive, or annoying software or program code. Software is considered malware based on the perceived intent of the creator rather than any particular features. Malware includes computer viruses, worms, trojan horses, most rootkits, spyware, dishonest adware, crimeware, and other malicious and unwanted software.

xi. *Metadata*: "Metadata" are data contained in a file that is not usually associated with the content of a file but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it and the date the image was taken.

xii. *Steganography*: "Steganography" is the art and science of communicating in a way that hides the existence of the communication. Within the computer world, It can be used to

NOV − 3 2014

000016

hide a file inside another.  For example, a child pornography image can be hidden inside another graphic image file, audio file, or other file format.

xiii.  _Trace Route_: A "trace route" is an Internet debugging tool used to document the list of inter-connected computers between two computers on the Internet. A trace route will list the names and IP addresses of computers that provide the physical link between two computers on the Internet. Trace routes are useful tools to help geographically identify where a computer on the Internet is physically located, and usually includes information about the registered owner of computers on the Internet.

xiv.  _Uniform Resource Locator (URL)_: A "uniform resource loator" is the address of a resource or file located on the Internet.  It is also called a "domain name."

xv.  _Web site Hosting_: "Web site hosting" provides the equipment and services required to host and maintain files for one or more web sites and to provide rapid Internet connections to those web sites. Most hosting is "shared," which means that multiple web sites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a web site, the client needs a server and perhaps a web hosting company to host

NOV 13 2014
000017

it. "Dedicated hosting" means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a web site. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co-location facilities offer customers a secure place to physically house their hardware and equipment as opposed to keeping it in their offices or warehouses, where the potential for fire, theft, or vandalism is greater.

xvi.  The terms "*records*" and "*information*" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writings, drawings or paintings); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## HISTORY OF SUBJECT DEVICES

10.     On January 18, 2014, SA Sean Shanahan, U.S. Army CID, assigned to Ft. Wainwright CID office in Fairbanks, Alaska, seized the SUBJECT DEVICES

NOV − 3 2014

000018

from Building 3442, Room 310A, Ft. Wainwright, Fairbanks, Alaska. The room was assigned to U.S. Army Specialist Kaleb Basey. Special Agent Shanahan obtained authorization from Military Magistrate Jennifer A. Brewer to search Basey's room and seize the digital evidence. In addition, prior to their seizure, Basey provided written and verbal consent to seize and search the SUBJECT DEVICES. Basey revoked his consent on January 22, 2014.

11.    Despite this prior authorization to search and seize, SA Goeden is seeking authority to search the SUBJECT DEVICES utilizing the probable cause outlined below. Since the time of seizure, the SUBJECT DEVICES have remained in law enforcement custody. As explained below, searches of digital evidence that has been maintained in a forensically-sound manner by law enforcement months after their seizure is possible. Moreover, in other situations where there were delays between the facts giving rise to probable cause and the forensic search, courts have upheld the legality of the search from challenges based on staleness. See, e.g. United States v. Lacy, 119 F.3d 742 (9th Cir. 1997) (10-month delay between facts giving rise to probable cause and seizure was permissible); see also United States v. Johnson, 865 F.Supp.2d 702 (D.MD 2012).

## COMPUTERS AND CHILD PORNOGRAPHY

12.    Based upon my training and experience as well as my discussions with others involved in child pornography investigations, computers and computer technology have revolutionized the way in which child pornography is produced,

000019

NOV -     7ME

distributed, received and possessed:

    a. Child pornographers can now transfer photographs onto a computer directly from a digital camera or from a regular camera by using a scanner. A computer's electronic storage media (commonly referred to as the hard drive) can store tens of thousands of images at a very high resolution. In addition, magnetic storage located in host computers makes it possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image in another country. Once done, there is no readily apparent evidence at the "scene of the crime." Only careful laboratory examination of electronic storage devices can recreate the evidence trail.

    b. A modem allows a computer to connect to another through a telephone, cable, or wireless connection to allow contact with millions of computers around the world. The Internet and World Wide Web provide child pornographers several relatively secure and anonymous ways to obtain, view and trade child pornography. Users can find individuals with similar interests or child pornography websites. Distributors can use membership and subscription-based websites to conduct business.

    c. Collectors and distributors of child pornography can set up an account

NOV – 3 2014

000020

**Attachment D, Page 20 of 60**

with a remote computing service that provides e-mail services and electronic file storage. Evidence of such online storage of child pornography may be found on the user's computer.

d. Information can be saved or stored on a computer intentionally. For example, a person may save an e-mail as a file or may save a favorite website in a "bookmark" type file. Information can also be retained unintentionally. For example, traces of an electronic communication path may be stored automatically in temporary files or Internet Service Provider client software. In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Internet distributors and recipients of child pornography may be identified by examining the recipient's computer, including the Internet history and cache to look for "footprints" of the websites and images accessed by the recipient. A forensic examiner often also can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files that were uploaded or downloaded.

e. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive or viewed via the Internet. Even when such files have been deleted, they

NOV − 3 2014.
000021

can often be recovered by forensic tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside for long periods of time in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space (free space or slack space). In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## COMPUTERS AND CHILD PORNOGRAPHY

13.  Based upon my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers and

NOV — 3 2014
000022

computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child pornography use various distribution networks, including but not limited to, personal email contacts, file-sharing services, f- and list serves, and membership-based/subscription-based web sites to conduct business, allowing them to remain relatively anonymous.

    14.    The development of computers has also revolutionized the way in which child pornography collectors interact with each other, and sexually exploit children. Computers serve four basic functions in connection with child pornography: production, communication and distribution, and storage. More

NOV ~ 3 2014

000023

Attachment D, Page 23 of 60

specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

    a.  Production: Producers of child pornography can now produce high resolution still and moving images directly from a common video or digital camera. In this day and age, these types of cameras have become ubiquitous, and are located on nearly every cell phone sold. Once taken, images and videos can be saved onto a computer or uploaded onto a website or attached to an email within seconds. While still on the camera or after being saved onto a computer or uploaded into a photo or video editing program, images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. Videos can be edited, or spliced together to create montages of abuse that can be several minutes to several hours long. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow. In some cases, depending upon the sophistication of the producer, it may be virtually impossible to law enforcement to determine the source of a sexually explicit image.

NOV 2 8 2014
000024

b. <u>Communication and Distribution</u>: The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. In addition, the Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) web sites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer to look for "footprints" of the web sites and images accessed by the recipient.

c. <u>Storage</u>: The computer's capability to store images in digital form makes it an ideal repository for child pornography. Moore's law

000025  NOV - 3 2014

predicts that the number of transistors in a dense integrated double circuit doubles approximately every two years. In the computing world, this translates to a doubling of computer memory capacity roughly every 24 months. It is not uncommon to encounter hard drives with 1 terabyte or more of data. According to Apple, Inc., 1TB of data can hold approximately 2 million standard resolution photographs. If those images are in high-resolution format, the number decreases to 26,000. *See* http://www.dpreview.com/forums/thread/3467175. A 1TB drive can also hold 357 DVD quality movies. *See* http://wiki.answers.com/Q/How_many_standard_movies_can_be_stored _on_a_1TB_external_hard_drive. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 1 terabyte are not uncommon. These drives can store thousands of images at very high resolution. Storage options located outside the physical boundaries of a computer add another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer, and save that image to the cloud or to a server located in another country. Once this is done, there may be no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage

NOV − 3 2014

000026

devices is it possible to recreate the evidence trail.

## FACTS SUPPORTING PROBABLE CAUSE

*Background of the Investigation*

31.     On January 16, 2014, a concerned citizen contacted the Alaska State Troopers (AST) regarding a posting on Craigslist.  The citizen saw a posting on Craigslist Casual Encounters M4W (men looking for women) indicating they were looking for a woman with a daughter to share.  The posting had a picture of a clothed young girl lying on a couch.   The citizen advised the posting stated "any dads or moms want to share a daughter with me for the night? Just gauging interest, must have a daughter.  Respond with torchat id if you got one.  Fit, attractive, kinky, hung male."

32.     Craigslist.com is a classified advertisement website with sections devoted to jobs, housing, personals, for sale, items wanted, services, community, gigs, resumes, and discussion forums.  Based on my training and experience, I know that Craigslist is used by individuals engaged in the commercial sexual exploitation of minors.  I also know that Craigslist is used to solicit individuals to engage in sexual encounters, and that on occasions these sexual encounters may target minors directly, or may involve adults who have access to minors.

33.     In my training and experience, I am aware of cases in which adults solicit individuals through Craigslist and other similar forums, and seek access to

NOV 03 2014

000027

Attachment D, Page 27 of 60

"sons" or "daughters," or access to children through their parents. In these cases, by referencing sons or daughters, or children, the individuals are generally seeking access to minors. In my training and experience, I am aware that individuals who use Craigslist to post advertisements can post these advertisements from a computer or a smartphone. In addition, individuals who post on Craigslist have the option of being contacted by interested individuals that view the ad via email, telephone, or SMS text (i.e. text messaging).

34. On January 17, 2014, AST Investigator Kirsten Hansen, Alaska Bureau of Investigation (ABI) obtained and served State of Alaska search warrant 3AN-14-00106SW for Craigslist for information related to the above posting. Craigslist responded and provided the following information:

    Posting ID#:  4289756436
    Poster email:  swingguy23@yahoo.com
    User ID:  201774824
    Poster IP:  65.74.101.215
    Auth User Phone:  7656175858
    Record Created:  Wed Jan 15 2014  21:46:26 (Pacific)
    Posted Date:  Wed Jan 15 2014  21:46:30 (Pacific)
    Record Modified:  Thu Jan 16 2014  22:15:38 (Pacific)
    Area Description:  Fairbanks
    Category Description:  Casual Encounters
    Category Type:  Personals
    Posting Title:  daughter share – m4w
    Posting Body:  any dads or moms want to share a daughter with me for the night?  just gauging interest, must have a daughter.  respond with torchat id if you got one.  fit, attractive, kinky, hung male here

    Torchat is a reference to a secure anonymous instant messaging service

offered through the TOR network. TOR stands for "the Onion Router" and is free

Page 27 of 56

NOV – 3 2014

000028

software that enables online anonymity by directing internet traffic through a network of relays distributed around the world.

35.    Craigslist also provided a copy of the photograph attached to the posting. The photo depicts a young-looking female lying on a couch. She is wearing jeans and a pink t-shirt. Her jeans are sitting below her hips and her shirt is pulled up exposing her midriff.

36.    On January 17, 2014, AST Investigator Ramin Dunford obtained and served State of Alaska search warrant 3AN-14-00106 SW for Internet Protocol (IP) address 65.74.101.215, which was the IP address for the above described posting on Craigslist. This Internet Service Provider (ISP) assigned this IP was GCI. GCI responded and provided the following information regarding the GCI customer utilizing the IP address at the date and time of the Craigslist posting:

    Name: Kaleb Basey
    Address: 3442 Ile De France, Room 310A, Ft. Wainwright, Fairbanks, Alaska
    Telephone Number: 765-617-5858
    Service Type: Cable Modem
    Service Activation Date: 8/23/2013

37.    On January 17, 2014, Investigator Hansen was advised by an investigator in the AST Technical Crimes Unit that there was another posting on Craigslist that appeared similar to the above-described posting. The picture associated with this posting was of an adult female hugging a young-looking female from behind with the adult females hand down the front of the child's pants. The young-looking female in the picture appeared to be the same female in the

000029

photograph associated with the first Craigslist ad. The posting stated "im a good looking guy looking for a mom who has a young daughter shed like to share with me for taboo fun. It's a lot warmer here in int Alaska today".

38.   On January 17, 2014, AST Technical Crimes Unit (TCU) Sgt David Willson advised he attempted to reply to the new Craigslist posting in an undercover capacity, however, the posting had been deleted.

39.   On January 18, 2014, SA Sean Shanahan applied for and obtained a Search and Seize Warrant for Building 3442, Room 310A, Ft. Wainwright, Fairbanks, Alaska. The search warrant was authorized by Military Magistrate LTC Jennifer A. Brewer. Special Agent Shanahan seized the SUBJECT DEVICES from Room 310A, at which time it was confirmed the room was occupied by Kaleb Basey.

*Interview of Caleb Basey*

40.   On January 18, 2014, CID SA Shanahan interviewed Basey at the Ft. Waingwright CID office. Basey was not in custody and agreed to speak with SA Shanahan. SA Shanahan advised Basey of his rights and Basey signed a written waiver and agreed to speak with SA Shanahan. Basey was advised of his rights twice. Initially he was advised of them related to solicitation to engage in sexual assault with a child and prostitution. After making statements in which he indicated that child pornography would be located on his computer, the interview was stopped and Basey was advised of his rights related to possession, distribution,

NOV − 3 2014

000030

and receipt of child pornography. In his interview with CID, Basey admitted to the following:

a. Basey arrived at Ft. Wainwright in June 2013.

b. Basey admitted to posting the two Craigslist postings in which he was seeking mother's willing to share their daughters. Basey stated he posted the ads because he wanted to try something new sexually. Basey advised he obtained the photographs to use for the postings by doing a google search for "non nude preteen". Basey stated he posted ads similar to this before but did not get responses.

c. Basey stated he had child pornography on his computer. He advised the child pornography photos and videos would found on his Mac computer in a folder labeled downloads. Basey indicated the images and videos on his computer were from the previous day or two. He had other child pornography on his computer from previous downloads but he deleted it.

d. Basey advised he was searching for and looking at child pornography on the internet prior to enlisting in the military.

e. Basey listed several search engines/websites he has used to download child pornography. He also listed two programs he has used to trade child pornography and identified one of the recipients by name.

f. Basey stated he recently met a 17-year-old female in Fairbanks on meetme.com. He told her he wanted to make a sex video with her and

Page 30 of 56

NOV − 3 2014
000031

have multiple males involved in the video. Basey stated he met the girl at a local hotel and paid her $60 for sex. He did not make a video of the girl and did not offer an explanation as to why it didn't happen.

g. Basey stated he has multiple email accounts including swingguy23@yahoo.com and a student email from when he attended the University of Indiana.

41.    On January 22, 2014, Basey, through his attorney, revoked his consent to search the SUBJECT DEVICES. The SUBJECT DEVICES were not returned to Basey as they contained contraband, and were evidence, fruits, and instrumentalities of criminal conduct.

*Additional Craigslist Postings*

42.    Special Agent Goeden met with CID SA Shanahan and AST Investigator Hansen on July 30, 2014, to discuss possible Federal jurisdiction over this matter. SA Goeden advised the FBI would proceed with the investigation. Subsequently, Special Agent Shanahan forwarded the case materials to SA Goeden on August 15, 2014. The SUBJECT DEVICES remain in the possession of CID at Fort Wainwright, Fairbanks, Alaska.

43.    On October 24, 2014, SA Goeden served a Federal Grand Jury subpoena to Craigslist for all postings related to email account swingguy23@yahoo.com and the IP address utilized in the postings described above. On October 30, 2014, Craigslist responded to the subpoena with numerous postings

NOV − 3 2014
000032

in addition to the two postings described above. Below are some of the postings provided by Craigslist in response to the grand jury subpoena. The postings below do not represent all of the postings provided by Craigslist. Clint Powell, Law Enforcement Relations, Craigslist, advised that Craigslist does not maintain images related to postings beyond 60 days from the posting date.

a. On August 8, 2013, swingguy23@yahoo.com posted an ad on the casual encounters section of Craigslist titled "Big Cock for young girl – m4w". The body of the posting read: "8inches for a little girl. You be sexy and 18 or under. Might be generous if you're the right age;)".

b. On September 27, 2013, swingguy23@yahoo.com posted an ad on the casual encounters section of Craigslist titled "mommy needs money – m4w". The body of the posting read: looking for a mom with a daughter. wanting this to happen soon. must be discreet, obviously I will be too. I can't host, but will get hotel room if 3 of us meet first."

c. On September 27, 2013, swingguy23@yahoo.com posted an ad on the casual encounters section of Craigslist titled "mommy needs money – m4w". The body of the posting read: "looking for a mom with a daughter. wanting this to happen soon. must be discreet, obviously I will be too. I can't host, but will get a hotel room if 3 of us meet first."

d. On November 23, 2013, klbasey@umail.iu.edu posted an ad on the casual encounters section of Craigslist titled "babysitting – m4mw". The body of

NOV – 3 2014

000033

the posting read: "let me babysit your daughter while you have a fun night on the town. I can teach her some cool things while your're out. Maybe she'll show you what she learned;) serious replies only -35 deg tonight."

e. On December 14, 2013, swingguy23@yahoo.com posted an ad on the casual encounters section of Craigslist titled "Need money bad? – m4w". The body of the posting read: "I can help you out if you help me out. Moms only. Must be open to me taking private pics/video."

f. On December 27, 2013, swingguy23@yahoo.com posted an ad on the casual encounters section of Craigslist titled "looking for single mom w/ daughter – m4w". The body of the posting read: "Looking for a lonely mommy with a cute lil girl that could use a man in her life. I'd love to get to know you girls and have some fun together. Very open minded on what we can do. -45 in Fairbanks today, Friday."

## PROBABLE CAUSE TO SEARCH THE SUBJECT DEVICES

44.     Your affiant is familiar with smartphones including the Apple iPhone. I know that individuals can post on websites such as Craigslist from their cellphone. Apple iPhone's can store photos and videos. Users can email or text images and videos from their iPhone. There are also numerous apps available through Apple that can be used on an iPhone to view, send, or receive images or videos.

## CHARACTERISTICS OF CHILD PORNOGRAPHERS

Page 33 of 56

Attachment D, Page 34 of 60

Case 4:14-cr-00028-RRB   Document 45-4   Filed 04/21/15   Page 34 of 60

45.     My knowledge of preferential sex offenders and their characteristics is based on my experience as an FBI agent, and other training specific to child exploitation crimes and related computer storage I have received. Based upon such training and experience, as well as upon information provided to me by other law enforcement officers, I am aware of the following general characteristics of those who possess, view, receive, distribute, and produce child pornography, which may be exhibited in varying combinations:

a.  Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity.

b.  Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videos, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children often use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the

NOV – 3 2014

000035

inhibitions of children they are attempting to seduce, to arouse the
selected child partner, or to demonstrate the desired sexual acts.

c.  Individuals who have a sexual interest in children or images of
children often maintain their collections in a safe, secure and private
environment, such as a computer hard drive or separate digital media.

d.  Individuals who have a sexual interest in children or images of
children also may correspond with and/or meet others to share
information and materials, and conceal such correspondence as they do
their sexually explicit material.  Individuals may often maintain lists
of names, e-mail addresses or telephone numbers of individuals with
whom they have been in contact, and who share the same interests in
child pornography.

e.  Individuals who have a sexual interest in children or images of
children prefer not to be without their child pornography for any
prolonged time period.  This behavior has been documented by law
enforcement officers involved in the investigation of child pornography
throughout the world.  The result is that individuals may travel with
some or all of their collections, and that evidence of an individual's
interest in child pornography may be located in their vehicles.  This is
particularly true given the portable nature of many laptops computers,

NOV − 3 20

000036

Attachment D, Page 36 of 60

tablets, and storage devices that allow for easy transport between and individuals home and their ultimate destination.

46. I respectfully submit that there is probable cause to believe that an individual found to be utilizing the computer located at the SUBJECT DEVICES is a collector of child pornography. This opinion is based upon the fact that a suspect computer located at the SUBJECT DEVICES has been identified pursuant to this investigation as an instrumentality in the receipt and distribution of child pornography, and my knowledge and investigative experience related to the habits and tendencies of child pornography distributors. I also base this opinion on my investigative experience gained during the execution of previous search warrants related to individuals identified as distributors of child pornography in unrelated investigations, namely, that individuals identified as distributors of child pornography have been found to be in possession of significant quantities of child pornography.

47. Finally, based upon the conduct of individuals involved in the collection of child pornography set forth above, namely that they tend to maintain their collections at a secure, private location for long periods of time, there is a probable cause to believe that evidence of the offenses of production, distribution, receipt, and possession of child pornography may currently located at the SUBJECT DEVICES.

NOV − 3 2014
000037

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

48.     Searches and seizures of evidence from computers and other Internet access devices require agents to seize most or all electronic items (hardware, software, passwords and instructions) to be processed later by appropriate personnel in a controlled environment. Digital storage media may include but is not limited to floppy disks, hard drives, tapes, DVD disks, CD-Rom disks or other magnetic, optical or mechanical storage which can be accessed by computers or other electronic devises to store or retrieve data of images of child pornography, which can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine whether it is included in the search warrant. This sorting process renders it impractical to attempt this kind of data search on site.

49.     Searching digital evidence systems for criminal evidence requires experience in the computer and cellular telephone field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since digital evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

NOV ~ 3 2014

000038

**Attachment D, Page 38 of 60**

50.     Computers and other digital communications devices contain volatile memory that contains information only while the device is in a powered on and/or running state. I know that powering off the device may result in the loss of the volatile information. Adding an external evidence storage device will cause minor changes to the state of the computer but will allow for the best effort in fully capturing the state of the running evidence. This capture of information requires technical expertise to ensure the resulting data can be examined by all subsequent investigators. This captured information may include current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details relevant to use of the system.

51.     In order to fully retrieve data from a computer or other digital communications system, the analyst needs all magnetic storage media as well as the storage devices.  In addition, the analyst needs all the system software (operating systems or interfaces, and hardware access software or drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as all instruction manuals or other documentation and data security devices, and all items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.  In cases like the instant one where the evidence consists partly of image

NOV − 3 2014
000039

and video files, the monitor and printer are essential to show the nature and quality of the graphic images, which the system could produce. Finally, where there is probable cause to believe that the computer and its storage devises, the monitor, keyboard, and modem, hardware and software are all instrumentalities of the crime of possession, receipt, or transportation of sexually explicit depictions of minors in violation of federal law, they should also all be seized as such.

52.     As further described in Attachment B, this warrant seeks permission to locate in the SUBJECT DEVICES not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and who used them. Further, as described above and in Attachment B, this application seeks permission to search and seize records that might be found on the SUBJECT DEVICES, in whatever form they are found. One form in which the records might be found is that they are stored on a computer's hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media seized.

53.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer hard drives can contain other forms of electronic evidence as

NOV – 3 2014
000040

well. In particular, records of how a computer has been used, the purposes for which it was used, and who has used it are called for by this warrant. As described above, data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration information on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals (e.g., cameras and printers for creating or reproducing images), the attachment of USB flash storage devices, and the times and dates the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can sometimes be evidence of a crime, or can point toward the existence of evidence in other locations. Evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B is included within the scope of the warrant.

000041  NOV — 3 2014

54.     In finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular thing is not present on a drive.  For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge.  This software can allow a computer to be used by others.  To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present on the computer, and, if so, whether the presence of that malicious software might explain the presence of other things found on the computer's hard drive.

55.     Law enforcement personnel trained in searching and seizing computer data will seize the SUBJECT DEVICES, and transport the same to an appropriate law enforcement laboratory for off-site review.  The SUBJECT DEVICES will be reviewed for the evidence described in Attachment B in accordance with and as defined by the review protocols described below.

56.     I know from training and experience that persons trading in, receiving, distributing or possessing images involving the exploitation of children or those interested in the actual exploitation of children often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the origin of the images as well as provide evidence of a person's interest in child pornography or child exploitation.

NOV − 3 2014

000042

57.    I know from training and experience that files related to the exploitation of children found on computers and other digital communications devices are usually obtained from the Internet or from cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the method of location or creation of the images, search terms used, and the exchange, transfer, distribution, possession or origin of the files.

58.    I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

59.    I am familiar with and understands the implications of the Privacy Protection Act (PPA), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware that any of the materials to be searched and seized from the SUBJECT DEVICES are protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

60.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no

NOV − 3 2014

000043

cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  The search for these files and file fragments can take considerable time, depending on the computer user's practices.

61.    I know from training and experience that computers or other digital devices used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the device, ownership and use of any

NOV – 3 2014

000044

external devices that had been attached to the computer or other digital devices, as well as ownership and use of Internet service accounts used for the Internet or cellular data network access.

62.     I know from training and experience that digital crime scenes usually include items or digital information that would tend to establish ownership or use of digital devices and Internet access equipment and ownership or use of any Internet service or digital cellular service accounts used to participate in the exchange, receipt, possession, collection or distribution of child pornography.

## SPECIFIC METHODS OF SEARCHING FOR DIGITAL EVIDENCE

63.     I am seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B.  Consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

64.     The search of a computer hard drive or other computer storage medium is a time-consuming manual process often requiring months of work.  This is so for a number of reasons, including the complexity of computer systems, the

NOV − 3 2014

000045

multiple devices upon which computing can take place, and the tremendous storage capacity of modern day computers, and the use of encryption or wiping software. As explained above, modern day computers and storage devices are capable of holding massive quantities of child pornography, and the volume of evidence seized in these cases can be immense. I am aware of cases in which individuals have possessed more than 100,000 images of child pornography on their computer, multiple computers and hard drives, or dozens of storage media upon which contraband images were found. I know from my training and experience, and from my discussions with trained computer forensic examiners, that a review of such quantities of evidence can take a significant amount of time. Second, there is a limited pool of personnel capable of conducting a forensic examination. Third, in some instances an individual may utilize encryption software or other publically-available techniques such as wiping software to hide their collections of child pornography. Forensic tools are available to circumvent some of these techniques; however, these tools may require a significant allocation of resources and a substantial period of time.

65. Some or all of the following search methods may be used to conduct the forensic search in this case. These methods are not listed in any particular order, nor is their listings in this affidavit a representation that they will be used in this particular case:

NOV − 3 2014

000046

**Attachment D, Page 46 of 60**

a. *Keyword Searches*: I know that computer forensic utilities provide the capability for a user to search for specific key words that may exist on a piece of digital media. I intend to use specific keywords known to be related to either the subject's illicit internet activities or child pornography. As it concerns child pornography, examples of such keywords include, but are not limited to "preteen," "hussyfan," and "r@ygold." Those keyword searches will indicate files and other areas of the hard drive that need to be further reviewed to determine if those areas contain relevant data. A list of keywords utilized will be maintained with the records of the forensic examination.

b. *Data Carving*: I know that, as previously mentioned, data residue may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the space not currently used by active files. I further know that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files that can be carved out, often in an automated or semi-automated fashion. I intend to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose me to the contents of such recovered files, but makes those files

NOV – 3 2014

000047

available for further relevancy checks, such as keyword searches
(explained above) and hash value comparisons (explained below).

c.   *Hash Value Comparisons*: I know that computer forensic utilities
provide the capability to utilize a function known as a hash algorithm.
A hash algorithm uses a mathematical formula to analyze the data
composing a file, and to generate a unique "fingerprint" for that file.
The act of hashing a piece of data does not reveal to an investigator
any information about the contents of that data.  However, I know that
computer forensic applications often contain databases of known hash
values for files.  Some of those files are "ignorable," which enables
other forensic processes to ignore files (such as the Windows operating
system) that are not evidentiary in nature.  Some of the files are "alert"
files, such as the Child Victim Identification Program (CVIP) hash set
that contains hash values for a small subset of the identified picture
and video files for known victims of child pornography.  CVIP alert
files notify an examiner that a file appears to contain known depictions
of child pornography.  I seek permission to utilize automated hash
value comparisons to both exclude irrelevant files, and to locate known
child pornography files.  Hash value comparisons are useful, but not
definitive, as even a single-bit change to a file will alter the hash value
for the file. The forensic review team does not intend to rely solely on

NOV − 3 2014

000048

**Attachment D, Page 48 of 60**

hash value comparisons, but intends to utilize them in order to assist with identifying relevant evidence. The use of this search method is intended to narrow the search. A search of known hash values, however, will not be used exclusively, because I know that when previously identified images of child pornography are found on a target's computer, typically there are many more images of child pornography depicting unknown child victims. Using a hash value search method exclusively would not uncover these images of unknown child victims as well as other evidence authorized by this warrant and described in Attachment B.

d. *Opening Container Files, Encrypted Volumes, Embedded Files*: I know that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, I intend to use sophisticated forensic tools to attempt to open any such container files that may reasonably contain evidence of child pornography.

NOV − 3 2014

000049

e. *File Header / Extension Checks*: I know that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. I intend to run an automated header comparison to detect such efforts, and intend to review any such files that reasonably may contain evidence of child pornography.

f. *Thumbnail / Image Views*: Although hash value comparisons can positively identify known child pornography depictions, a negative hash value comparison does not exclude an image from suspicion. There is no known alternative for visually inspecting each image file. I therefore intend to examine at least a thumbnail image of each image file on the digital media whether "live," "data carved," or identified by header.

g. *Registry / Log File Checks*: I know that it is necessary in any criminal case to establish not only that a crime has occurred, but also to

Page 49 of 56

NOV − 3 2014

000050

**Attachment D, Page 50 of 60**

establish what person committed that crime.  Operating systems and computer programs often maintain various administrative files such as logs that contain information about user activities at certain times.  In the Windows operating system, for example, some of these files are collectively referred to as "the registry".  Such files contain specific information about users, often including e-mail addresses used, passwords stored, and programs executed by a particular user.  These files may also contain evidence regarding storage devices that have been connected to a computer at some time.  Multiple backup copies of such files may exist on a single computer.  I intend to examine these files to attempt to establish the identity of any user involved in the receipt, possession, distribution, and transportation of child pornography, and to establish methods (such as software used) and dates of this activity.

h. *Metadata / Alternative Data Streams*: I know that many file types, operating systems, and file systems have mechanisms for storing information that is not immediately visible to the end user without some effort.  Metadata, for example, is data contained in a file that is not usually associated with the content of a file, but is often associated with the properties of the application or device that created that file.  For example, a digital camera photograph often has hidden data that

NOV − 3 2014

000051

contains information identifying the camera that manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file that would not be immediately visible to an end user without some action taken. I know that both metadata and alternative data streams may contain information that may be relevant to child pornography offenses. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. I intend to review any such data that is flagged by any process above as being relevant to the receipt, possession, distribution, and transportation of child pornography.

66.    With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

67.    I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described

000052 NOV – 3 201

above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original. Upon the completion of the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again run on the image copy to insure no alterations of the data occurred during the examination process.

68. Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B). Moreover, upon identification of contraband, the item is subject to forfeiture, and the owner has a reduced expectation of privacy in those seized devices. Consequently, should a seized device be found during the authorized forensic review to contain child pornography, it will be retained by the United States, and may be searched without further authorization of the Court for the evidence described in Attachment B. Such a later search may be required for the following reasons:

    a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts.

000053 NOV - 3 2014

b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified. Specifically in this case, based on the nature of P2P file-sharing, forensic analysis may identify the user names and screen names of those distributing child pornography to the user of the target computer(s).

d. The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

Page 53 of 56

NOV 13 2014

000054

Attachment D, Page 54 of 60

e. Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

69. In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

70. As explained above, the search and seizure of the SUBJECT DEVICES by CID was authorized by a United States Military Magistrate. In addition, consent to search and seize the devices was obtained from Basey. A search of the SUBJECT DEVICES was performed by CID personnel; however, the United States has not relied on any information from that search in this affidavit. No other attempts to acquire the sought-after information have been made.

### REQUEST FOR SEALING

71. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document

000055

NOV − 3 2014

is necessary because the items and information to be seized are relevant to an ongoing undercover investigation and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

///

///

///

///

///

///

///

///

///

///

///

///

Page 55 of 56

NOV – 3 2014

000056

## CONCLUSION

71.    I submit that this affidavit supports probable cause for a warrant to search the SUBJECT DEVICES described in Attachment A and seize the items described in Attachment B.

SIGNATURE REDACTED

JOLENE GOEDEN
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 3 day of November 2014

/S/ DEBORAH M. SMITH
U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

DEBORAH M. SMITH
United States Magistrate Judge
District of Alaska
Anchorage, Alaska

NOV − 3 2014

000057

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF )
)
)
Apple Macbook Pro2, Model#A1289, )
Serial NumberYM0410CWEUE, and )
)
Black iPhone, Model A1387, IC#579C- )
E2430A )

Case No. 3:14-MJ-00326-DMS

**UNDER SEAL**

## ATTACHMENT A

*Property to be searched*

The property to be searched is as follows:

1.   Apple Macbook Pro2 computer, serial number YM0410CWEUE, and
2.   Black Apple iPhone, model A1387, IC#579C-E2430A.

Both items are currently stored at the CID office Ft. Wainwright, Fairbanks, Alaska.



NOV ~ 3 2014

000058

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) ) ) | Case No. 3:14-MJ-00326-DMS |
| Apple Macbook Pro2, Model#A1289, Serial NumberYM0410CWEUE, and | ) ) ) ) | **UNDER SEAL** |
| Black iPhone, Model A1387, IC#579C-E2430A | ) ) ) | |

## ATTACHMENT B

*Property to be seized*

1.     The following items to be seized constitute contraband, fruits, instrumentalities, and evidence of violations, or attempted violations, of 18 U.S.C. §§ 2251, 2252(a)(2) and 2252A(a)(2), and 2252(a)(4)(B) and 2252A(a)(5)(B), relating to the crimes of distribution, receipt and possession of visual depictions of minors engaging in sexually explicit conduct and child pornography, and 2422(b), relating to the coercion and enticement of a minor:

       a.     Child pornography;

       b.     Child erotica;

       c.     Visual depictions of minors engaged in sexually explicit conduct;

       d.     Online postings, information, correspondence, records, documents or other materials constituting evidence of or pertaining to child pornography, child erotica, or visual depictions of minors engaged in sexually explicit conduct; or constituting evidence of or pertaining to the production, possession, receipt, distribution, accessing, or transmission through interstate or foreign commerce of child pornography,

Page 1 of 2

NOV − 3 2014

000059

child erotica, or visual depictions of minors engaged in sexually explicit conduct; or constituting evidence of or pertaining to an interest in child pornography or sexual activity with children;

e. Correspondence with adults that discuss the sexual exploitation of a minor;

f. Correspondence with minor children;

g. Records or documents evidencing ownership or use of computer equipment found in the SUBJECT DEVICES, including sales receipts, bills for Internet access, and handwritten notes; and

2. For any computer or storage medium, including mobile phones, whose

seizure is otherwise authorized by this warrant (SUBJECT DEVICES):

a. evidence of who used, owned, or controlled the SUBEJCT DEVICES at the time the things described in this warrant were created, edited, or deleted;

b. evidence of the times the SUBJECT DEVICES was used;

c. passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICES;

d. documentation and manuals that may be necessary to access the SUBJECT DEVICES, or to conduct a forensic examination of the SUBJECT DEVICES; and

e. records of or information about the SUBJECT DEVICES' Internet activity, including Internet Protocol addresses used by the SUBJECT DEVICES.

NOV − 3 201

000060